# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| LAURA L. PHILLIPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-10-S-477-NE |
| | ) | |
| TACALA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Laura L. Phillips, asserts a claim against her former employer, Tacala, LLC, for failure to pay wages and overtime in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq.* ("FLSA").[1]  The case currently is before the court on defendant's motion for summary judgment[2] and defendant's motion to strike plaintiff's declaration.[3]  Upon consideration of the pleadings, briefs, and evidentiary submissions, the court concludes the motion to strike is due to be granted in part and denied in part, and the motion for summary judgment is due to be granted.

## I. STANDARD OF REVIEW

---

[1] *See* doc. no. 1 (Complaint).  The case originally was filed as a putative collective action, with plaintiff and another individual, Beth Sheets, as representative plaintiffs. *See id.*  However, all of Ms. Sheets' claims were dismissed on May 13, 2011, and no motion for conditional class certification ever was filed. *See* doc. no. 23.  Accordingly, the case has proceeded since May of 2011 as an individual claim by plaintiff Laura Phillips.

[2] Doc. no. 26.

[3] Doc. no. 38.

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. MOTION TO STRIKE

Defendant asks the court to strike plaintiff's declaration, which was filed with her opposition to defendant's motion for summary judgment, because it is inconsistent with her prior deposition testimony, and because it contains irrelevant testimony. To the extent the motion to strike is based upon alleged irrelevant testimony in plaintiff's declaration, it will be denied. The court is capable of discerning what testimony is relevant to the issues raised on summary judgment. It is not necessary that irrelevant statements be stricken from the record. The determination of whether portions of plaintiff's declaration should be stricken as inconsistent with prior deposition testimony, however, requires more analysis.

The Eleventh Circuit has held that "a party cannot give 'clear answers to unambiguous questions' in a deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987) (quoting *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)). The

Eleventh Circuit has cautioned, however, that this so-called "sham affidavit" rule

should be applied "'sparingly because of the harsh effect it may have on a party's

case.'"  *Nichols v. Volunteers of America, North Alabama, Inc.,* 470 F. App'x 757,

2012 WL 1320125, at *3 (11th Cir. April 18, 2012) (pagination for the Federal

Appendix not available on Westlaw) (quoting *Latimer v. Roaring Toyz, Inc.,* 601 F.3d

1224, 1237 (11th Cir. 2010)).

> [T]he court must be careful to distinguish "between discrepancies which
> create transparent shams and discrepancies which create an issue of
> credibility or go to the weight of the evidence." *Tippens v. Celotex
> Corp.*, 805 F.2d 949, 953 (11th Cir.1986).
>
>> [E]very discrepancy contained in an affidavit does not
>> justify a district court's refusal to give credence to such evidence.
>> In light of the jury's role in resolving questions of credibility, a
>> district court should not reject the content of an affidavit even if
>> it is at odds with statements made in an early deposition.
>
> *Id.* at 954 (quoting *Kennett–Murray Corp. v. Bone*, 622 F.2d 887, 894
> (5th Cir.1980)) (alteration in original) (citation omitted).

*Faulk v. Volunteers of America*, 444 F. App'x 316, 318 (11th Cir. 2011) (first

bracketed alteration supplied, second bracketed alteration in original).

Defendant argues that several statements from plaintiff's declaration are

inconsistent with her prior deposition testimony.  The court will address each

statement, or group of statements, in turn.

**A.   Testimony About Time Spent as Assistant General Manager**

-4-

In her February 14, 2012 declaration, plaintiff stated:

> While I worked as an [Assistant General Manager ("AGM")] in the South Cullman store, I spent *the majority of my working time* performing the same tasks as those performed by Tacala's employees who were paid by the hour and were eligible to receive overtime compensation; these tasks included, but were not limited to, cooking food, preparing food orders, operating cash registers, and cleaning the store.[4]

During her deposition, which was taken on May 20, 2011, plaintiff testified that, while she was an AGM, she "typically" served as the Manager-In-Charge ("MIC") whenever she was in the store.[5]   The MIC was the manager in charge of, or responsible for, the store whenever she was on shift.  She would "run the shift," make sure "everybody [was] in their places," and was "in control of the money."[6]  Plaintiff also answered "Yes, Sir," to the following questions:  (1) "As an AGM, your responsibility was for the performance of the store while you were there, correct?"[7]; (2) "As an AGM, you were responsible for managing the store during the shifts that you ran?"[8]; and (3) "And that's a responsibility you had throughout the time you were

---

[4] Doc. no. 34 (plaintiff's evidentiary submission), Exhibit A (Declaration of Laura Phillips), at ¶ 7 (emphasis supplied).

[5] Doc. no. 27 (defendant's evidentiary submission), Exhibit 1 (Deposition of Laura Phillips), at 61.

[6] *Id.* at 60.

[7] *Id.* at 122.

[8] *Id.* at 127.

working as an AGM?"[9]

Plaintiff's declaration is not entirely inconsistent with her deposition testimony on this point.  It is reasonably possible for plaintiff to have been the head managerial employee "in charge" of a shift, and still end up spending more than half of her working hours performing the same tasks as non-managerial employees, such as cooking and serving food.

**B.      Testimony About Duties Performed**

In paragraph 10 of her declaration, plaintiff stated that "[t]he designated MIC would oversee his or her particular shift while also performing the same tasks as Tacala's hourly workers."[10]  In paragraph 13, she stated:

> Even if I was designated to be the MIC for a shift, I frequently had to stop or delay performing duties associated with the MIC to perform non-managerial duties, such as working the drive through window, sweeping floors, and cleaning Tacala's kitchen utensils and equipment so hourly employees could be sent home when their shift ended in order to prevent the accumulation of overtime compensation.[11]

In paragraph 32, she stated, "As an AGM in the South Cullman store, I never investigated or resolved legal problems, employment issues, operation management issues, or any other matter of significance on behalf of Tacala's management."[12]

---

[9] *Id.* at 128.

[10] Phillips Declaration, at ¶ 10.

[11] *Id.* at ¶ 13.

[12] *Id.* at ¶ 32.

Defendant asserts that these statements conflict with plaintiff's earlier deposition testimony that, when she was MIC, which was "typically," she was "responsible for all of the operations of the store," regardless of what specific tasks she was performing at any given time, and that she was "responsible for ensuring that everything that needed to be done at the store was done and getting employees to do that."[13]

Again, the court does not find inherent inconsistencies between plaintiff's declaration and the identified deposition testimony.  It is reasonably possible that plaintiff would regularly be required to perform a combination of managerial and non-managerial duties during any given shift.  Plaintiff could be "in charge," or "responsible," during any given shift, even while she was performing non-managerial tasks.

The court does, however, find inconsistencies between plaintiff's statement that she "never investigated or resolved legal problems, employment issues, operation management issues, or any other matter of significance on behalf of Tacala's management," and *other* portions of plaintiff's testimony.  As discussed more fully below in the section entitled "Summary of Facts," plaintiff testified during her deposition that she was in charge of making sure each shift ran smoothly, coaching

---

[13] Phillips Deposition, at 61, 97-98.

employees on their performance, disciplining employees for performance or behavioral problems, setting performance goals, and ensuring compliance with corporate policies.  Those duties seem to this court to fall under the descriptions of "employment issues" and "operation management issues," which plaintiff previously stated were not part of her job.  Accordingly, the court concludes that paragraph 32 of plaintiff's declaration should be stricken as inconsistent with her prior deposition testimony.[14]

## C.    Overlapping Schedules of RGM and AGM

In paragraph 11 of her declaration, plaintiff stated:  "As an AGM in the South Cullman store, I was usually the MIC only for Saturday when the [Restaurant General Manager ("RGM")] was not working and if I worked when the RGM was off on a weekday."[15]  In paragraph 12, she states:  "When I worked a shift as an AGM in the South Cullman store and was not designated to be the MIC, I performed the exact same duties and had the same responsibilities as the non-managerial, hourly workers."[16]

---

[14] Additionally, plaintiff's statement in paragraph 32 — that she did not perform any "matter of significance" for Tacala — is so vague as to be of any benefit to the court's analysis.  There is no discernable standard for determining what plaintiff would deem to be a "matter of significance," and no way of knowing whether that determination, if it could be performed, would have any *legal* significance.

[15] Phillips Declaration, at ¶ 11.

[16] *Id.* at ¶ 12.

During her deposition, plaintiff testified that, throughout the time period she served as AGM, she was "typically" the MIC whenever she was in the store.[17]  She also testified that the MIC would not necessarily be the highest ranking employee in the store at any given time.  Instead, the RGM might be scheduled to work during a given shift, but she might spend the shift doing paperwork in the office after designating another employee to serve as the MIC on the work floor.[18]  Finally, plaintiff testified that, while she was the AGM at the South Cullman store, she would serve as MIC, even if there was another employee eligible to work as shift manager during the same shift.[19]

There is nothing in this deposition testimony that is inconsistent with paragraph 12 of plaintiff's declaration.  Assuming that there were shifts during which plaintiff was an AGM but not an MIC, it is reasonable to conclude that, during those shifts, plaintiff would have performed the same duties as any other hourly worker.

The closer question is whether plaintiff has offered inconsistent testimony as to how often she actually did serve as MIC.  Looking solely at the declaration and the deposition transcript themselves, the court must conclude that they are inconsistent.  Plaintiff testified during deposition that she was "typically" the MIC whenever she

---

[17] Phillips Deposition, at 61.

[18] *Id.* at 71-72.

[19] *Id.* at 96.

was in the store.  The on-line edition of the Oxford English Dictionary defines the word "typically" as meaning "So as to constitute a type; in conformity with the type; representatively; characteristically." *Oxford English Dictionary*, http://www.oed.com (last visited August 3, 2012).  If working as the MIC is to be "characteristic" or "representative" of plaintiff's usual duties, it must have occurred at least a majority of the time.  Paragraph 11 of plaintiff's declaration, on the other hand, strongly suggests that plaintiff was only *seldomly* the MIC at the South Cullman store, or at least that she served as the MIC *less often than not*.

Plaintiff attempts to explain away that inconsistency by pointing to the work schedules from the South Cullman store, which she claims "show that Phillips frequently worked along side, and sometimes the exact same shift with, the [RGM] of the South Cullman store."[20]  However, the schedules do not establish as much as plaintiff wishes they did.  In fact, as defendant points out in its reply brief, after a very thorough analysis of the schedules, the majority of plaintiff's hours were worked when no other manager was present in the store.[21]  Even if that were not so, and plaintiff actually worked more hours alongside the RGM than not, that would not contradict plaintiff's testimony that she was "typically" the MIC.  Plaintiff could have

---

[20] Doc. no. 41 (plaintiff's brief in opposition to motion to strike), at 4.  Presumably, plaintiff is making this argument because the schedules are part of her deposition testimony, and they are consistent with the statement from her declaration.

[21] *See* doc. no. 43 (defendant's reply in support of motion to strike), at 4-7.

been assigned to work as the MIC even if the RGM was on the shift, and, indeed, plaintiff testified that that situation sometimes arose.  Plaintiff also argues that, when plaintiff testified that she was "typically" the MIC, she could have been referring to the three-month time period when she was the AGM at another store in Hartselle, Alabama.  The record, however, does not reasonably support that conclusion.

It also should be noted that, in her brief in opposition to defendant's motion for summary judgment, plaintiff failed to contradict defendant's proposed fact no. 32, which stated, "As an AGM, Phillips was typically the MIC when she was in the restaurant."[22]  According to the Uniform Initial Order that was entered in this case on June 16, 2010, "*All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*"[23]  Thus, plaintiff has admitted, for purposes of this court's consideration of defendant's motion for summary judgment, that she "typically" served as MIC when she was in the restaurant.  As such, her argument that the schedules appended as exhibits to her deposition somehow alter her actual deposition testimony that she "typically" served as MIC holds even less water.

---

[22] Doc. no. 28 (defendant's brief in support of summary judgment), at 7, Proposed Fact No. 32.  *See also* doc. no. 29 (plaintiff's brief in opposition to summary judgment), which does not contain any response to defendant's Proposed Fact No. 32.

[23] Doc. no. 9 (Uniform Initial Order), at 16 (emphasis in original).

In summary, paragraph 11 of plaintiff's declaration contradicts not only her sworn deposition testimony, but also her admission of facts in response to defendant's motion for summary judgment.  Accordingly, paragraph 11of the declaration is due to be stricken, and the court will not consider that paragraph in deciding the motion for summary judgment.

**D.**     **Testimony About Job Interviews**

In paragraphs 14-16 of her declaration, plaintiff stated:

> 14.    As an AGM in the South Cullman store, I never interviewed a job applicant.
>
> 15.    The RGM of the South Cullman store always conducted the interviews.
>
> 16.    As an AGM in the South Cullman store, I never chose which prospective employees would be hired.[24]

During her deposition, plaintiff consistently testified that she did not schedule or conduct interviews of prospective employees at the South Cullman store. However, she also testified that, throughout her time at the South Cullman store, she would "screen" employees before they met with the RGM.  She would let the RGM know her opinion about whether the employee should be interviewed, and the RGM "sometimes" followed her suggestion.  On one or two occasions, the RGM would interview an applicant despite plaintiff's suggestion that the applicant should not be

---

[24] Phillips Declaration, at ¶¶ 14-16.

interviewed.[25]

This deposition and declaration testimony is not inconsistent. "Screening" applicants before an interview is not the same thing as actually conducting the interview. Accordingly, these statements need not be stricken from plaintiff's declaration.

## E.     Conclusion About Motion to Strike

Based on all of the foregoing, defendant's motion to strike will be granted in part and denied in part. Only paragraphs 11 and 32 of plaintiff's declaration will be stricken.

## III. SUMMARY OF FACTS

Defendant, Tacala, LLC ("Tacala"), owns and operates 162 Taco Bell restaurants in six states, including Alabama.[26] Each Taco Bell restaurant has one Restaurant General Manager ("RGM") and at least one Assistant General Manager ("AGM"), who are responsible for managing the restaurant and its employees, and for ensuring that the restaurant operated in accordance with Tacala policies and procedures.[27] At all times relevant to this lawsuit, Tacala classified the RGM and

---

[25] Phillips Deposition, at 109.

[26] Defendant's evidentiary submission, Exhibit 2 (Declaration of Angelique Gisin), at ¶ 2.

[27] *Id.* at ¶ 3; defendant's evidentiary submission, Exhibit 3 (Declaration of Laura Maravi), at ¶ 3.

AGM positions as managerial positions exempt from the coverage of the Fair Labor Standards Act.  Therefore, the RGM and AGM were paid a salary, not on an hourly basis, and they were not eligible for overtime compensation.[28]

Plaintiff, Laura Phillips, began working for Tacala on October 3, 2007.[29]  She trained for six weeks at the Taco Bell restaurant in Hartselle, Alabama, and then she was assigned to work as one of two AGM's of the South Cullman Taco Bell store.[30] She worked at South Cullman until March of 2009, when she became the acting RGM at the Hartselle location.  At first, plaintiff was only temporarily replacing the former RGM, who had to suddenly leave the position, but after two months in Hartselle, her temporary position became permanent.[31]  Before plaintiff received the promotion to RGM, she had to submit to an evaluation of her past performance as an AGM.[32] Plaintiff's superiors noted the results of that evaluation on a document called a "Readiness Checklist," the purpose of which was to evaluate her readiness to serve as an RGM.  The evaluation covered items such as plaintiff's abilities to:  coach team members on methods to improve service and quality; serve as a role model to other team members; respond to customer feedback; handle customer concerns; assist other

---

[28] Gisin Declaration, at ¶ 3.

[29] Phillips Deposition, at 28.

[30] *Id.* at 28-29, 31-32, 35.

[31] *Id.* at 38-41.

[32] *Id.* at 123-24.

team members in addressing customer concerns; build a sense of team during shifts; forecast and determine scheduling needs for the restaurant; ensure that employees are properly trained; develop a team member for the Shift Manager position; coach and improve the performance of poorly performing team members; delegate tasks and follow up effectively; resolve complaints by team members; set high standards for appropriate team behavior; recognize good performance in team members; perform closing tasks; identify and resolve sales and profit problems at the restaurant; and set goals and assignments for team members and provide feedback on their performance.[33]

As an AGM in South Cullman, plaintiff usually worked at least 50 hours each week.[34]  When plaintiff first became an AGM, she received a biweekly paycheck of $1,153.85, which equates to a yearly salary of $30,000.  In April of 2009, she received a raise to $1,176.98 biweekly, which equates to a yearly salary of $30,601.48.  When she was promoted to RGM, she began to earn a biweekly salary of $1,294.62, which equates to a yearly salary of $33,660.[35]  Plaintiff received her full salary every week of her employment with Tacala, except for her final week, when

---

[33] Phillips Deposition, Exhibit 19, at 2 ("Readiness Checklist").

[34] Phillips Deposition, at 59.

[35] *Id.* at 38-39; Gisin Declaration, at ¶ 4.

she was paid through the last day she worked.[36]   In addition to her regular pay, plaintiff received a quarterly bonus based on the performance of the restaurant, and a separate bonus based on the results of a customer survey.  Those bonuses were only available to the RGM, AGM, and shift leaders at a particular restaurant.[37]   Both locations where plaintiff worked usually scheduled at least four non-managerial employees to work at any given time.[38] Those non-managerial employees were paid hourly rates ranging from $7.25 to $8.75 per hour.[39]

The Taco Bell restaurants where plaintiff worked were open seven days a week, from 10:00 a.m. until 2:00 a.m. Sunday through Thursday, and from 10:00 a.m. until 3:00 a.m. on Friday and Saturday.[40]  The manager opening the store would arrive approximately one and a half hours prior to the start of the shift in order to prepare the store for opening.  The manager closing the store had to stay after the last shift until all of the cleaning and paperwork were completed.  It was preferred that all of the closing tasks be completed within one hour after closing, but those tasks sometimes took longer than one hour.[41]

---

[36] Phillips Deposition, at 152-57; Gisin Declaration, at ¶ 4.

[37] Phillips Deposition, at 43-44; Gisin Declaration, at ¶ 5.

[38] Phillips Deposition, at 36.

[39] Gisin Declaration, at ¶ 6.

[40] Phillips Deposition, at 46.

[41] *Id.* at 46-47.

Plaintiff testified that, while she worked for Tacala, the RGM and AGM in a particular restaurant would typically alternate their schedules so that one or the other would be in the restaurant at all times.[42]  At least one manager was scheduled to open the restaurant, at least one was scheduled to close it, and sometimes a different manager might be scheduled to work a shift in between opening and closing.[43]  That does not mean, however, that the AGM and RGM never worked the same shift.  In fact, as discussed above, the schedules appended to plaintiff's deposition establish that she *did* sometimes work the same shift as the RGM, although she and the RGM were more often than not scheduled on separate shifts.[44]

Tacala's official job description for the AGM position states that the AGM "serves as the assistant to the Restaurant General Manager and provides additional management coverage of operating hours and direct supervision of operations in an individual restaurant," including "driving excellence in customer service," "maintaining company standards in product and facility specifications," "supervising food handling procedures and operational processes," and "exercising basic, shift-to-shift financial control to meet the restaurant profit margin targets."[45]

---

[42] *Id.* at 60.

[43] *Id.* at 61.

[44] *See generally* Phillips Deposition, at Exhibit 9 (copies of Tacala work schedules).

[45] Phillips Deposition, Exhibit 6 (Tacala, LLC Assistant General Manager Position Description), at 1.

> In addition, the AGM assumes full responsibility for specific financial controls, crew training assignments and the screening of prospective employees under the direction of the RGM.  The AGM directly performs hands-on operational on an on-going basis to train employees, respond to customer service needs or otherwise role model appropriate skills and behaviors in the restaurant.[46]

The primary areas of accountability for the AGM position included customer satisfaction and product quality, financial, operations, and human resources.[47] Plaintiff acknowledged during her deposition that the official job description accurately described the duties of the AGM position.[48]

At all times, including when more than one salaried manager was scheduled for the same shift, one manager was designated as the "Manager in Charge" or "MIC" during a particular shift.  The RGM would decide which employee would serve as MIC on any given shift.[49]  The MIC usually was the either the AGM or RGM on duty, but sometimes the RGM would designate a non-managerial, hourly employee as MIC. When an hourly employee served as MIC, that employee sometimes also was referred to as a "shift manager."[50]  While plaintiff was the AGM at South Cullman, she was "typically" the MIC whenever she was in the restaurant.[51]  The MIC was in charge of

---

[46] *Id.*

[47] *Id.* at 1-2.

[48] Phillips Deposition, at 123.

[49] Phillips Declaration, at ¶ 8.

[50] *Id.* at ¶ 9; Phillips Deposition, at 96.

[51] Phillips Depositon, at 60-61.

all of the restaurant's operations and employees during her shift, including the following responsibilities:

- ensuring that company policies were followed and correcting employees who did not follow the appropriate policies[52]

- ensuring that all required tasks were performed on every shift[53] and that the shift ran "smoothly"[54]

- completing and verifying the accuracy of the end-of-shift paperwork, including the shift performance report, and signing off on the prior shift's performance report[55]

- ensuring that employees met their speed of service goals[56]

- tracking inventory costs and performing food safety audits[57]

- ensuring that safety and security procedures were followed[58]

- performing an "MIC walk" every hour during the shift to ensure that the restaurant and premises were clean[59]

---

[52] *Id.* at 72, 87.

[53] *Id.* at 97-98.

[54] *Id.* at 72.

[55] *Id.* at 73-74.

[56] *Id.* at 87-88.

[57] Phillips Deposition, at 89-91.

[58] *Id.* at 94-95.

[59] *Id.* at 96-97.

- addressing customer complaints[60]

- contacting the Tacala Area Coach to arrange for any necessary maintenance and repair work[61]

- being held accountable by upper management for the revenue, food costs, customer service, and employees on the shift[62]

- coaching employees to perform their work properly and efficiently[63]

- opening the restaurant, including reviewing the previous night's performance and paperwork, and making sure all employees performed the tasks required to ready the restaurant for customers[64]

- creating a "deployment chart" at the beginning of each shift so that each employee (including employees with specialities such as cooking, working the register, and food preparation) would know what tasks they were supposed to perform during the shift[65]

- making sure there were enough employees scheduled to perform the required work on each shift, but not so many employees that the

---

[60] *Id.* at 79.

[61] *Id.* at 91-92.

[62] *Id.* at 74.

[63] Phillips Deposition, at 96-97.

[64] *Id.* at 114-16.

[65] *Id.* at 67-68.

restaurant's allotted number of "labor hours" was exceeded[66]

- monitoring employees' dress and sending home any employees who did not comply with the dress code[67]

- closing the restaurant after the last shift each day, including preparing paperwork, counting money, and making sure the restaurant was clean.[68]

In addition to performing these managerial duties, the MIC also was required to perform many of the same tasks as hourly workers, including cooking food, preparing orders, operating the cash register, and cleaning the store.  It was especially important for plaintiff, as MIC, to perform whatever tasks were necessary for the hourly employees to be sent home on time, so that they would not accumulate any overtime hours.[69]

As AGM, plaintiff also had duties in addition to the duties of the MIC.  The AGM also was responsible for creating a positive working environment for employees and a positive dining environment for customers.[70]  The AGM also oversaw the training of new hires, and signed off on the training once it was

---

[66] *Id.* at 99, 117-18.

[67] *Id.* at 98.

[68] *Id.* at 116-17.

[69] Phillips Declaration, at ¶¶ 10, 13.

[70] Phillips Deposition, at 83.

satisfactorily completed.[71]  As AGM, plaintiff also was responsible for issuing verbal or written discipline to employees when appropriate.[72]  A written disciplinary action in an employee's file could adversely affect the employee's later chances for a promotion or pay raise.[73]  The AGM could recommend to the RGM that an employee be terminated for failing to correct disciplinary problems.[74]  However, plaintiff never actually fired an employee while she was AGM at the South Cullman store.  Instead, the RGM always made any termination decisions.[75]

The AGM also assisted the RGM in the hiring process by "screening" applicants.  The AGM would review an applicant's resume and sometimes to talk to the applicant, then make a recommendation to the RGM about whether the applicant should be interviewed.  The RGM usually would accept the AGM's recommendation about which applicants to interview.[76]  However, plaintiff never actually conducted an interview or selected an applicant as the AGM at the South Cullman store.  The RGM performed those functions instead.[77]  Plaintiff also had no authority as AGM to decide how much any new hire or current employee would be paid, or even

---

[71] *Id.* at 112-13.

[72] *Id.* at 102.

[73] *Id.*

[74] *Id.* at 104-06.

[75] Phillips Declaration, at ¶¶ 17-18.

[76] Phillips Deposition, at 108-09.

[77] Phillips Declaration, at ¶¶ 14-16.

whether any employee should be paid on an hourly or salaried basis.[78]

Plaintiff has not disputed that she had all these managerial responsibilities as AGM.  Even so, she testified that she spent the majority of her actual hours on the job performing the same types of tasks as hourly employees, including cooking food, preparing food orders, operating the cash registers, and cleaning the store.[79]

Plaintiff also presented evidence about the types of duties she did *not* perform, or was not authorized to perform, as AGM at the South Cullman store.  She stated that she could not determine what techniques were to be used in any aspect of the restaurant's operation, including opening and closing, food preparation, and customer complaints.  Instead, plaintiff was required to follow Tacala's policies and the directions of her RGM on these matters.[80] She could not decide what kind of kitchen equipment would be used in the restaurant, which vendors or suppliers to use for materials and supplies, or which types of food and drink products would be sold at the restaurant.[81]  She could not regulate the flow and distribution of food, drinks, condiments, napkins, plastic silverware, or any other items, because those decisions were made by the RGM.[82]  Even so, it appears that, as AGM, plaintiff may sometimes

---

[78] *Id.* at ¶ 19.

[79] *Id.* at ¶ 7.

[80] *Id.* at ¶ 20.

[81] *Id.* at ¶¶ 21-23.

[82] *Id.* at ¶ 24.

have been allowed to place orders for supplies.[83]  As AGM, plaintiff did not have the authority to plan or control the restaurant's budget or sales goals, although, as discussed above, she was responsible for ensuring that the budget was followed.[84] She also did not have the authority to commit Tacala in marketing efforts, sales promotions, creating or designing new products, or changing product vendors or suppliers.[85]  She could not legally bind Tacala by negotiating or signing any contracts or other agreements on Tacala's behalf.[86]  Further, as AGM, plaintiff never provided consultation or expert advice to any member of Tacala's management,[87] and she was never involved in developing or planning Tacala's business objectives.[88]  Finally, plaintiff never represented Tacala in arbitrating disputes or resolving grievances.  The only complaints she handled were customers' complaints about food orders or other aspects of customer service.[89]

## IV. DISCUSSION

---

[83] Phillips Deposition, at 119-20.

[84] Phillips Declaration, at ¶ 26.

[85] *Id.* at ¶ 27.

[86] *Id.* at ¶ 29.  Plaintiff's proposed statement of fact also states that she had "no authority to bind Tacala in any matter, large or small."  *See* doc. no. 33 (plaintiff's brief in response to motion for summary judgment), at Proposed Fact No. 26.  That statement goes beyond what plaintiff actually stated in her declaration, *i.e.,* "I had no authority to obligate or bind Tacala in any matter . . . ." Phillips Declaration, at ¶ 29.

[87] *Id.* at ¶ 30.

[88] *Id.* at ¶ 31.

[89] *Id.* at ¶ 34; Phillips Deposition, at 78-79.

-24-

The FLSA requires employers to pay all covered employees at least a statutorily-prescribed minimum wage for each hour worked. 29 U.S.C. § 206(a)(1). The Act also requires employers to pay covered employees at a rate of one and a half times their usual rate of pay for each hour over forty hours worked in a given week. 29 U.S.C. § 207(a). Section 216(b) of the FLSA provides the following remedy for violations of those provisions:

> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

29 U.S.C. § 216(b).

Plaintiff alleges that defendant violated the FLSA by failing to pay all regular wages and overtime compensation due to her. Importantly, she has narrowed her FLSA claim to include *only* her time as AGM at the South Cullman store; she does not contend that she fell under the provisions of the FLSA while she was the RGM in Hartselle.[90]

Defendant, on the other hand, asserts that the overtime provisions of the FLSA did not apply to plaintiff while she was AGM at the South Cullman store because she fell under the so-called "executive exemption" set forth in 29 U.S.C. § 213. That

---

[90] Doc. no. 33, at 6, Proposed Fact No. 1 ("Phillips claims she was not exempt from the FLSA only while she worked as an AGM in Tacala's South Cullman store.").

statute provides, in pertinent part, that "[t]he provisions of section 206 . . . and section 207 of this title shall not apply with respect to — (1) any employee employed in a bona fide *executive*, administrative, or professional capacity . . . ."  29 U.S.C. § 213(a)(1) (emphasis supplied).

The fact that Tacala classified the AGM position as exempt from FLSA requirements is not the sole determining factor.  *See* 29 C.F.R. § 541.2 ("A job title alone is insufficient to establish the exempt status of an employee.").  Instead, [t]he exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of [FLSA regulations]."  *Id.* (bracketed alterations supplied).

The FLSA regulations define the term "employee employed in a bona fide executive capacity" as meaning:

> any employee:
>
> (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

Plaintiff has not contested that she meets the first, third, and fourth of these regulatory requirements.  Indeed, the record demonstrates that, as AGM, plaintiff was paid a salary of more than $455 per week, that she customarily directed the work of at least two other employees, and that her suggestions and recommendations on employment decisions about other employees were given significant weight by the RGM.  Thus, the only remaining determination is whether plaintiff's "primary duty" as AGM in South Cullman was management of the restaurant.

Federal regulations provide additional guidance on the definition of the term "primary duty" in the exempt employee context:

(a) To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work.  The term "primary duty" means the principal, main, major or most important duty that the employee performs.  Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.  Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the

wages paid to other employees for the kind of nonexempt work performed by the employee.

(b) The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee.  Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement.  Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work.  Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

(c) Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register.  However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700.

The regulations also address a situation like the one presented here, where an employee performs a combination of exempt and non-exempt duties.

(a) Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met.  Whether an employee meets the requirements of § 541.100 when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in § 541.700.  Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain

responsible for the success or failure of business operations under their management while performing the nonexempt work.  In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. An employee whose primary duty is ordinary production work or routine, recurrent or repetitive tasks cannot qualify for exemption as an executive.

(b) For example, an assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management.  An assistant manager can supervise employees and serve customers at the same time without losing the exemption.  An exempt employee can also simultaneously direct the work of other employees and stock shelves.

(c) In contrast, a relief supervisor or working supervisor whose primary duty is performing nonexempt work on the production line in a manufacturing plant does not become exempt merely because the nonexempt production line employee occasionally has some responsibility for directing the work of other nonexempt production line employees when, for example, the exempt supervisor is unavailable. Similarly, an employee whose primary duty is to work as an electrician is not an exempt executive even if the employee also directs the work of other employees on the job site, orders parts and materials for the job, and handles requests from the prime contractor.

29 C.F.R. § 541.106.

Finally, the regulations define the term "management," as it is used in the context of determining exempt or non-exempt status.

Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of

-29-

employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

It is beyond reasonable dispute that plaintiff regularly performed some duties properly classified as "managerial" under the regulations.  She recommended applicants for interviews; trained new employees; assigned tasks to employees on each shift; helped with paperwork; appraised employees' performance; disciplined employees when necessary; ensured the safety and security of the employees, customers, and property; opened and/or closed the restaurant at the beginning and/or end of shifts; and ensured that other employees complied with Tacala's policies.  In short, at least when she was the MIC on a shift, she had overall responsibility for making sure the shift ran smoothly.

The real dispute is over whether plaintiff's managerial duties had priority over her other, non-managerial duties, including cooking and serving food, operating the

cash register, and cleaning the restaurant.  Plaintiff takes the position that she spent

more time performing non-managerial duties, and that her non-managerial duties were

more important to Tacala than her managerial duties.  She relies heavily upon the

Eleventh Circuit's decision in *Barreto v. Davie Marketplace, LLC,* 331 F. App'x. 672

(11th Cir. 2009), to support her argument.  There, the Eleventh Circuit reversed the

district court's grant of summary judgment in favor of the defendant employer,

holding that there were genuine issues of material fact with regard to whether the

manager of a supermarket's produce department was an "exempt" employee under the

FLSA.  *Id.* at 673, 678.  More specifically, there were fact issues with regard to

whether the plaintiff's primary duty was management.  Even though the plaintiff

acknowledged performing some managerial duties, such as ordering and pricing

produce and scheduling and directing the other produce department employees, the

record demonstrated that the plaintiff spent more than 50% of his time performing the

same tasks as hourly, non-exempt employees.  *Id.* at 675.  In fact, the plaintiff spent

so much of his time on non-exempt tasks that he sometimes was unable to perform

all of the required managerial tasks.  *Id.*  Further, the plaintiff testified that he had

little to no discretion regarding the manner in which he performed his managerial

tasks, and he was instead subject to heavy direct supervision.  *Id.* at 676.  Therefore,

even though the plaintiff's wages were significantly more than those of the non-

exempt employees in his department, the Eleventh Circuit concluded that "a reasonable factfinder could find that [the plaintiff's] managerial tasks did not constitute his 'primary duties' under the balancing test set forth in the Regulations." *Id.* (citing *Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1280-81 (11th Cir. 2008)).

The only real similarity between the present case and *Barretto* is that plaintiff, like Barreto, spent the majority of her actual work hours performing non-managerial tasks.  That fact alone, however, is not dispositive.  *See* 29 C.F.R. § 541.700(b) ("Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work.").  Other facts tend to support the conclusion that plaintiff's management duties were more important to Tacala than her non-management duties.  For example, even though plaintiff testified that she sometimes would have to cease performing her managerial duties to help other employees complete their non-managerial tasks within the time allotted, the evidence does not show that that situation was the norm, or that assisting hourly employees prevented plaintiff from performing all of her managerial duties.  Furthermore, plaintiff seems to have had more discretion than Barreto in performing her managerial tasks.  It is true that plaintiff's actions had to comply with Tacala policies and procedures, but within those boundaries, she had discretion in

performing her job duties.  If mandatory compliance with corporate policies was enough to place a manager outside the executive exemption, the number of people eligible for the exemption would be very few indeed.  *See Jackson v. Advance Auto Parts, Inc.,* 362 F. Supp. 2d 1323, 1335 (N.D. Ga. 2005) ("[T]he fact that Plaintiffs had to adhere to certain guidelines or in certain instances obtain the Store Manager's approval does not diminish Plaintiffs' discretionary powers.") (citations omitted). Finally, while plaintiff undeniably was subject to the authority of the RGM, there is no evidence that the RGM had a heavy hand in controlling plaintiff's day-to-day activities as AGM.

Instead, this case is more like those relied upon by defendant.  First, in *Diaz v. Team Oney, Inc.,* 291 F. App'x 947 (11th Cir. 2008), the Eleventh Circuit upheld the district court's grant of summary judgment in favor of the defendant on the basis that the plaintiff, the assistant manager of two Papa John's pizza restaurants, fell under the executive exemption to the FLSA.  *Id.* at 948.  Even though the plaintiff did frequently perform non-managerial tasks such as making and cutting pizzas, routing pizza deliveries, greeting customers and cleaning the store, the record was clear that

> his managerial duties — as the highest ranking employee on duty during the majority of his shifts, in which he supervised the drivers, counterpersons, and cooks, apportioned work, made deposits, filled out required forms, interviewed prospective employees, and engaged in local restaurant marketing — were significantly more important to the

operation of the restaurant than his non-managerial tasks.

*Id.* at 949 (citing 29 C.F.R. § 541.700(b), (c)).  Additionally, the plaintiff routinely made recommendations to the store manager on hiring and firing decisions, and he conducted the first interview of applicants.  Finally, and importantly, the plaintiff admitted that "he was 'in charge' of the restaurant for the majority of his shifts, except for the few hours that the store manager was present per day." *Id.* at 950.

In *Jackson v. Advance Auto Parts, Inc.,* 362 F. Supp. 2d 1323 (N.D. Ga. 2005), the district court granted summary judgment on the FLSA claims of three assistant managers at Advance Auto Parts stores because they did not fall under the "exempt employee" exception.  *Id.* at 1336.  Even though each of the plaintiffs testified that they spent 90% of their time performing non-exempt tasks like selling, cleaning, and operating the register, the evidence as a whole demonstrated that "managing and directing the day-to-day store operations are the most important functions of the Assistant Manager position."  *Id.* at 1334.  During the majority of their working hours, the plaintiffs worked without supervision, and they were in charge of their respective stores, meaning that they were responsible for delegating tasks to other employees, disciplining and training other employees, adjusting work schedules, handling customer complaints and refunds, and performing closing duties like verifying the cash register and preparing deposits and reports.  *Id.* at 1334-35.

Importantly, each of the plaintiffs acknowledged that even while they were performing non-exempt duties, "they were also still overseeing the other employees in the store and making sure that the store was operating properly."  *Id.* at 1335.

Similarly, in the present case, even though plaintiff testified that she spent more than half of her actual work hours performing non-exempt tasks, the record as a whole demonstrates that she was still acting in a managerial capacity even as she was performing non-exempt duties.  Plaintiff testified that, whenever she was the MIC on any particular shift, she was responsible for ensuring that the shift ran smoothly in all respects, including paperwork, customer service, safety, cleanliness, equipment functioning, work assignments, and employee discipline.  Furthermore, plaintiff was "typically" the MIC, indicating that she had these managerial responsibilities most of the time, even if she was actually performing other, non-managerial tasks.  This appears to have been true regardless of whether the RGM was also in the store while plaintiff was MIC.  In any event, there is no evidence that the RGM regularly exercised significant control over plaintiff's day-to-day activities.  Instead, plaintiff appears to have typically had the discretion to decide when it was appropriate for her to perform exempt vs. non-exempt tasks.  Finally, it should be noted that plaintiff earned significantly more than the hourly, non-exempt employees working in the South Cullman restaurant.  Assuming that plaintiff worked 50 hours each week, her

$1,153.85 biweekly pay equates to $11.54 per hour.  In addition to that salary, plaintiff was eligible for bonuses that were not available to hourly employees.  In contrast, hourly employees earned only $7.25 to $8.75 per hour, and they apparently were typically not allowed to work more than forty hours per week.[91]  Thus, the maximum amount an hourly employee could earn during a biweekly pay period would be $700, or $8.75 per hour for a total of 80 hours.  Even assuming that an hourly could work up to 50 hours per week, the maximum amount she could earn during a biweekly pay period would be $962.50, or $8.75 per hour for a total of 80 hours ($700), plus $13.125 per hour (time-and-a-half) for the 20 additional hours of overtime ($262.50).

In summary, considering all the facts as a whole, the record supports the conclusion that plaintiff fell under the "executive employee" exemption to the requirements of the FLSA while she was working as an Assistant General Manager at Tacala's South Cullman restaurant.  Accordingly, summary judgment is due to be granted in defendant's favor on plaintiff's FLSA claim.[92]

## V. CONCLUSION AND ORDER

---

[91] The court reaches this conclusion based on plaintiff's testimony that she would often have to take over the work of hourly employees in order to prevent them from earning overtime pay.

[92] Because summary judgment is due to be granted on these grounds, there is no need to consider defendant's alternative arguments (*i.e.,* that plaintiff was exempt under the FLSA's "administrative exemption," that judicial estoppel bars plaintiff's claims, and that plaintiff lacks standing to pursue her claims).

In accordance with the foregoing, defendant's motion to strike is GRANTED in part and DENIED in part.  It is ORDERED that paragraphs 11 and 32 of plaintiff's declaration are STRICKEN.

Furthermore, the court finds that there are no genuine issues of material fact, and that judgment as a matter of law is due to be entered in favor of defendant.  Accordingly, defendant's motion for summary judgment is GRANTED, and all of plaintiff's claims are DISMISSED with prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

DONE and ORDERED this 10th day of August, 2012.

_____
United States District Judge